UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY D. GRIFFETH,

    Plaintiff,   Civil Action No. 04-74754

v.   HON. JOHN FEIKENS
U.S. District Judge
HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL   U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Gary D. Griffeth brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Part a of Title XVIII of the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on June 24, 2002 (Tr. 40-42). After denial of the initial application, Plaintiff filed a timely request for an administrative hearing, conducted on March 22, 2003 in Lansing, Michigan before Administrative Law Judge (ALJ) Larry Meuwissen.

Plaintiff, represented by Milton Utter, testified (Tr. 233-282), as did Vocational Expert (VE) Michelle Ross (Tr. 482-287). ALJ Meuwissen found that Plaintiff was not disabled because his residual functional capacity did not preclude him from performing his previous jobs as a scheduler and code enforcement officer (Tr. 21). On October 5, 2004 the Appeals Council denied review (Tr. 4-6). Plaintiff filed for judicial review of the final decision on December 6, 2004.

## BACKGROUND FACTS

Plaintiff, born April 20, 1947, was 57 when the ALJ issued his decision (Tr. 21, 40). A high school graduate, his past work includes jobs as a highway contractor, highway foreman, code enforcement officer, carpenter, and scheduler (Tr. 14-15, 78). Plaintiff alleges disability due to colostomy, shoulder pain, pain induced sleep disorder, and poor memory and concentration (Tr. 15).

### A.     Plaintiff's Testimony

Plaintiff testified that he lived with his wife who worked as a bookkeeper for a lumber company (Tr. 237). He reported that he stood approximately 5' 10" and weighed 212 pounds (Tr. 237). He stated that he retained a driver's license and had driven himself to the hearing, adding that he drove to Wisconsin periodically to visit relatives and had traveled to Switzerland with his wife in the past year (Tr. 238).

Plaintiff reported that he had graduated from high school and had taken some college courses (Tr. 240). He stated that he had last worked in 2001 as a carpenter, installing moldings and cabinets until he was laid off for reasons unrelated to his alleged disability (Tr.

240-241). He testified that he collected unemployment for thirty-nine weeks after his termination and that during the same period he actively looked for work (Tr. 241-242). He admitted that he was relieved to be laid off, stating that he was "actually sick" of carpentry work and was not interested in performing work in related areas, such as home and construction site inspection (Tr. 242). He stated that he previously owned his own business performing estimates before taking a job with a municipality (Tr. 243-244).

Plaintiff reported that he currently took Wellbutrin, Neurontin, and Aricept (Tr. 245). He stated that he attended had attended counseling sessions for the past seven years, admitting that his care provider told him that he was "not crazy enough to miss work (Tr. 246, 248). He estimated that he could walk a maximum of once around the block, stand for a maximum of fifteen minutes, and sit for no more than thirty minutes (Tr. 248). He indicated that aside from the usual difficulties he encountered when "shopping with a woman," accompanying his wife on her mall trips was aggravated by back and knee pain (Tr. 248).

Plaintiff testified that in addition to back and knee pain, he experienced arm and hand weakness (Tr. 249). He indicated that even a moderate amount of physical labor would cause intense pain in his elbow (Tr. 249). He stated that he arose at approximately 7:30 a.m. and spent his days cooking, fishing, visiting, working in his wood shop, and helping friends out with projects (Tr. 252). He stated that he also acted as a maintenance worker at a small apartment building he owned (Tr. 252). He reported that he mowed his lawn and maintained a fishing boat (Tr. 253-254). He stated that he owned a motorcycle, but could not ride more

than thirty miles due to back pain (Tr. 258). He stated that his nightly sleep was often interrupted by body aches and the need to urinate (Tr. 261). He indicated that when he took long road trips he had to make frequent bathroom stops (Tr. 262). He stated that he first experienced urinary incontinence before undergoing prostate cancer surgery (Tr. 264). He testified that he had used a colostomy bag since undergoing additional cancer surgery (Tr. 266). He also complained of memory loss, stating that he often had to re-check commonly dialed telephone numbers and recipe instructions (Tr. 267-268). He estimated that due to body aches that he could not work more than three days in a five-day workweek (Tr. 271).

**B. Medical Evidence**

MRIs performed in March, 1990 and October, 1992 did not show recurrent neoplaxm or metastatic malignancy (Tr. 99, 100). In March, 1998, Plaintiff's treating physician, Timothy Oliver, M.D., noted that Plaintiff had been out of Neurontin for a week and had experienced irritability and symptoms of depression returning (Tr. 132). In April, 1999, Dr. Oliver reported that Plaintiff was taking his depression medication erratically - Neurontin at a higher than appropriate dose and Wellburtin at an inappropriately lower dose (Tr. 131). Notes from a September, 2000 exam state that Plaintiff's "[m]anic depressive illness . . . appears to be under reasonable control" (Tr. 129). Dr. Oliver reported in June, 2001 that Plaintiff was "getting along pretty well," noting that he was working at a construction job (Tr. 127). In October, 2001, a CT scan of his pelvis showed no evidence of metastatic disease (Tr. 105). Exam notes recorded the same month show that Plaintiff continued to work (Tr. 126). In July, 2002, Plaintiff complained to Dr. Oliver that his colostomy bag

caused problems when he performed construction work and that he was considering applying for disability (Tr. 124). Plaintiff also reported knee pain and stomach irritation (Tr. 124).

In September, 2002, Plaintiff sought counseling for family difficulties (Tr. 107). Plaintiff alleged depression due to "unmet expectations" (Tr. 107). Treating notes indicate that Plaintiff presented as "mildly depressed," with appropriate affect, stable mood, and did not report suicidal ideations (Tr. 107). Plaintiff expressed frustration that he was forced to use a colostomy bag, indicating that he felt frustration and shame at the times that the bag leaked (Tr. 107). Plaintiff's counselor noted that he tended to "wander from subject to subject" (Tr. 107). He assigned Plaintiff a GAF of 65-70[1] (Tr. 108).

A Psychiatric Review Technique Form (PRTF) completed in September, 2002 found that Plaintiff experienced an "adjustment disorder" (Tr. 112). The report concluded that Plaintiff experienced mild restriction of activities of daily living, finding that his social functioning appeared "intact," and further noting that Plaintiff believed he was entitled to a disability finding as a result of his "colostomy situation" (Tr. 119, 121, 123).

Dr. Oliver's notes of June, 2003 indicate that an orthopod told Plaintiff that "there really was not much wrong with [his knees]," but that Plaintiff then sought treatment from a neurologist (see below) who diagnosed bilateral carpal tunnel syndrome (CTS), telling him

---

[1]GAF scores in the range of 61-70 indicate "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000).

he had "bad" knees, as well as a bunion on his right foot (Tr. 169).

In June, 2003 neurologist Gavin I. Awerbuch, M.D., noting Plaintiff's complaints of body aches, found that Plaintiff experienced "a cumulative trauma syndrome due to his multiple years working as a carpenter" (Tr. 150). He also found that Plaintiff appeared to have bilateral knee derangements and a "cognitive impairment which may be a pseudo dementia related to depression or be related to underlying early dementia versus systemic or metabolic process" (Tr. 150). He recommended that Plaintiff use carpal tunnel braces (Tr. 148). In September, 2003, Dr. Awerbuch opined that Plaintiff's impairments would cause him to miss work a least three times a month, stating that he suffered from impaired sleep, and could not walk more than half a city block (Tr. 157, 159). Giving Plaintiff a "poor" prognosis, he stated that Plaintiff's impairments could be expected to last at least twelve months (Tr. 159).

### C. Vocational Expert Testimony

VE Michelle Ross classified Plaintiff's past relevant work as a self-employed contractor and work as a foreman as skilled at the heavy level of exertion (Tr. 282-283). She found that his work as a scheduler was semi-skilled at the light exertional level, and his work as a carpenter as semi-skilled at the light to medium exertional level (Tr. 283). The VE testified that if Plaintiff experienced all the limitations and impairments alleged and that if his testimony were deemed credible, he would be unable to sustain gainful employment due to his statement that he could not work more than three days a week, along with his professed need to nap occasionally (Tr. 286). The ALJ posed the following question to the VE:

> "Claimant is now in the category of a person approaching – or Claimant of advanced age under the categories of the Social Security regulations. Has a high school or better education. Does not have difficulties with communication. Assume such a person with the residual functional capacity (RFC) to perform light work. Subject to more than occasional overhead reaching with the left upper extremity. Right as – appears to be the dominant extremity. Possibly an option to sit or stand. Sitting probably about an hour at a time. Standing maybe up to 15 minutes. No ropes, ladders, scaffolds. No more than occasional ramps or stairs. No repetitive bending, twisting or turning or stooping. No squatting. Taking those factors into consideration, could such a person perform any of the Claimant's past relevant work?"

(Tr. 283).

The VE stated that given the above limitations, Plaintiff could perform his past relevant work as a scheduler as well as his zoning position (Tr. 283). She added that neither job would require more than minimal computer skills, describing inputting requirements as "basic" (Tr. 284). She stated further that Plaintiff retained transferable skills at the light and sedentary level as an estimator and home inspector (Tr. 284). She stated that approximately 1,300 scheduler, 2,400 estimator, 6,100 inspector, and 2,000 code enforcement positions existed in the lower two thirds of the lower peninsula of Michigan (Tr. 285). The VE stated that her testimony conformed to the Dictionary of Occupational Titles (DOT), with the exception of her sit/stand option conclusions which she drew from her own job analyses and those performed by other vocational experts (Tr. 286).

### D.     The ALJ's Decision

ALJ Meuwissen found that although Plaintiff experienced the severe impairments of degenerative disc disease and depression, neither impairment met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (Tr. 20). He found that Plaintiff retained the following RFC:

> "Work involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing (walking and standing 6 hours a day) or when it involves sitting most of the time (for 2hours a day) with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities, If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time"

(Tr. 19).

The ALJ concluded that Plaintiff retained the ability to perform his past relevant work as a scheduler and code enforcement officer (Tr. 21). Observing that Plaintiff "leads a very active life," he found Plaintiff's allegations of limitations "not totally credible" (Tr. 21). He cited Plaintiff's extended trip to Switzerland in 2003, remodeling activities, and home maintenance work as activities inconsistent with his alleged limitations (Tr. 19).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.

1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  Step Two Omissions

Plaintiff argues that the ALJ erred by omitting the exertional impairments of internal derangement of the knees, internal derangement of the left shoulder, plantar neuropathy, bilateral CTS, and colostomy from his Step two findings. *Plaintiff's Brief* at 14-15. Also noting that his counselor made repeated references to "thought process" problems, he contends his lack of concentration should have been listed as a severe impairment. He also maintains that Ideomotor Apraxia as diagnosed by Dr Awerbuch should have been listed as one of his Step Two impairments. *Id*. at 6.

20 CFR § 416.921(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." The same regulation defines "basic work activities" as "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." *Id.* The court in *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985) found that "the second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." The court cautioned that an "overly stringent interpretation of the severity requirement would violate the statutory standard for disability by precluding administrative determination of the crucial statutory question [of] whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education and experience." An impairment can be considered "not severe . . . only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that

it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" *Farris,* 773 F.2d at 90; *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984).

Substantial evidence, cited at length in the administrative decision, supports the ALJ's Step Two finding that Plaintiff's severe impairments were limited to degenerative disc disease and depression. While Plaintiff alleged that the use of a colostomy bag precluded his ability to perform gainful employment, that claim is unsupported by his medical records. Although Plaintiff complained to his mental health counselor that he was discouraged by occasional problems, as noted by the ALJ, his fifteen year use of a colostomy had not prevented him from performing physically demanding work (Tr. 16). A PTRF completed in September, 2002 ended with the comment that Plaintiff "truly thinks that he should be allowed . . . disability due to his colostomy situation. I have told him that this is not likely to happen" (Tr. 123). The reviewing physician added that Plaintiff "had this colostomy 15 years ago" (Tr. 123). Even assuming that at some point more closely following Plaintiff's surgery the use of a colostomy bag created conditions which would qualify the condition as a severe impairment, nothing in the relevant time frame suggests that the colostomy prevented Plaintiff from performing exertionally heavy and medium jobs at full functional capacity (Tr. 282-283). *See Buettner v. Secretary of Health and Human Services,* 686 F.Supp. 616,618 (W.D.Mich.,1988), where the court upheld the ALJ's Step Two finding that the claimant's lupus, although previously debilitating, was non-severe during relevant period and thus would not interfere with basic work activities.

In addition, the ALJ was entitled to reject Dr. Awerbuch's June, 2003 opinion that Plaintiff experienced ideomotor apraxia (Tr. 150). While Plaintiff urges the Court to adopt Dr. Awerbuch's finding of cognitive impairments (in spite of the fact Dr. Awerbuch's findings were explicitly rejected by the ALJ), the physician's "diagnosis" of ideomotor apraxia consists of his initial examination observation that "at times [Plaintiff] is slow to answer and he repeats himself. He is able to spell works forwards and backwards, but he only has 2 out of 3 recall. He has some ideomotor apraxia" (Tr. 150). However, other portions of Dr. Awerbuch's notes from the same examination appear to attribute Plaintiff's difficulty expressing himself to the fact that he "gets very stressed and upset" (Tr. 149).

Similarly, notes from Plaintiff's counseling sessions do not suggest a cognitive disorder. His counselor's multiple observations that his thought processes were "scattered," and that he had difficulty concentrating are often coupled with comments from the same sessions which indicated that Plaintiff, frustrated with aspects of his personal relationships, experienced a "catharsis" of emotions during the sessions (Tr. 175, 176, 179, 181, 182, 184, 185190, 192, 193, 200).

Likewise, substantial evidence supports the omission of CTS, internal derangement of the knees, internal derangement of the left shoulder, and plantar neuropathy from the ALJ's Step Two findings. The ALJ properly noted that Dr. Awerbuch, the primary source of the above diagnoses, should not be accorded the deference granted to a treating physician since he examined Plaintiff on only a few occasions after Plaintiff applied for disability benefits(Tr. 18). Plaintiff apparently concedes that no other physician confirmed Dr.

-12-

Awerbuch's finding that Plaintiff experienced CTS or plantar neuropathy.[2]  Indeed, Dr. Awerbuch's notes from an August 7, 2003 examination state only that Plaintiff "*may* also have a plantar neuropathy" (emphasis added) (Tr. 144).  Although Plaintiff argues that Dr. Awerbuch's diagnosis of internal derangement of the left shoulder is "confirmed" by the another physician's August, 2003 opinion,  Dr. Ciullo found that Plaintiff did not experience any "real loss of motion,"  stating that Plaintiff's abilities remained in "a functional range" (Tr. 153).  He conceded only that physical therapy and surgery may be necessary in the future (Tr. 154). Similarly, Dr. Awerbuch's diagnosis of internal derangement of the knees stands unsupported by any other material from the relevant period.[3]

---

[2]Although the ALJ notes that Dr. Awerbuch supports his CTS diagosis EMG findings, he rejected Dr. Awerbuch's opinion, stating that it was "merely an attempt to contrive evidence in support of a disability decision" (Tr. 18).  Further, Plaintiff admitted that he engaged in activities inconsistent with a CTS diagnosis, testifying that he operated a motorcycle on a regular basis and crafted furniture (Tr. 255, 258).  Finally, assuming that Plaintiff's alleged CTS had been listed among his Step Two impairments, its demonstrably minimal effect on his activities would have permitted the ALJ to omit it from the RFC (see section **B**.).

[3]Plaintiff cites an MRI of Plaintiff's knee, performed on June 15, 2003 which showed a "[m]edial meniscal tear in the posterior horn," which he argues lends credence to Dr. Awerbuch's diagnosis of internal derangement of the knee. *Plaintiff's Brief* at 14 *citing* Tr. 206-208.  However, this material, submitted subsequent to the administrative decision, cannot be considered by the Court pursuant to *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993).  In *Cotton*, the court held that where the Appeals Council denies a claimant's a request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton* 2 F.3d at 695-96.
Moreover, even if the Court were permitted to give weight to the late-submitted evidence, portions of this material become independently problematic to Plaintiff's claim (Tr. 202-230).  Among the newer submissions is a five page single-spaced letter from Plaintiff which criticizes the ALJ (among other reasons) for using his extended vacation to Switzerland the year before the hearing to discount his allegations of disability (Tr. 214).  The Plaintiff terms this portion of the administrative decision as "ridiculous," and

-13-

**B. Depression**

Plaintiff argues that the ALJ did not properly acknowledge his Step Two finding of depression in concluding that he could perform his previous work. *Plaintiff's Brief* at 6. Plaintiff maintains that after having found that a severe impairment existed at Step Two of the analysis, the ALJ then failed to factor the effects of depression into his Step Four decision. *Id*.

Although Plaintiff asserts that the ALJ contradicted himself by first finding that his depression was "severe," before ultimately deciding that "depression has little effect on the Claimant's ability to perform basic work related activities," the ALJ's Step Two finding that Plaintiff suffered from depression did not prevent him from concluding ultimately that it had at most, "minimal effect on his ability to concentrate." (Tr. 19).

As discussed in section **A.**, a finding at Step Two indicates only that the alleged limitation is not "totally groundless." *See Farris, supra; Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988). Although the ALJ found the "severe" impairment of depression at Step Two of his analysis, he used "severe" as a term of art as found in administrative decisions. Such a finding does not necessarily lead to the conclusion that Plaintiff is "severely depressed" in the more usual sense of the term. Further, the Step Two finding of depression did not

---

points out that his mother paid for his trip (Tr. 214). However, on the previous page, in another context, Plaintiff mentions that his mother is afflicted with Alzheimer's disease (Tr. 213). Further, according to Dr. Oliver's treatment notes dated July 9, 2002, Plaintiff's mother experienced the onset of Alzheimer's disease at least as early as the summer of 2002 (Tr. 124).

mandate its inclusion in the RFC. "The [RFC] is meant 'to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from . . . .' A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other." *Yang v. Commissioner of Social Security*, WL 1765480, 4 -5 (E.D.Mich.,2004); *Howard v. Commissioner of Soc. Security,* 276 F.3d 235, 240 (6th Cir.2002).[4]

More importantly, the administrative decision indicates that the ALJ actually considered Plaintiff's history of depression when reaching his Step Four determination. The RFC is directly followed by the comment that "although [Plaintiff] may have some depression with some minimal effect on his ability to concentrate, it would have little effect on the range of work he could perform" (Tr. 19). The ALJ then lists the activities currently performed by Plaintiff which led him to conclude than he was not disabled.

Finally, I reject Plaintiff's argument that "internal inconsistencies" (if they exist at all) in the ALJ's decision mandate a remand. Even assuming that all of the above mentioned conditions discussed in section **A.** should have been listed at Step Two, Plaintiff's testimony

---

[4]If the ALJ had made a Step five decision (while not able to perform past relevant work, a plaintiff retains the ability to perform jobs found in significant numbers in the national economy) rather than his Step Four finding, Plaintiff could perhaps have argued that the hypothetical question posed to the VE did not reflect his limitation of mild depression. *See Webb v. Commissioner of Social Security,* 368 F.3d 629 (6th Cir. 2004). However, ALJ is not required to pose a hypothetical question or even consult a VE in making a Step Four determination. "At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ." *Mays v. Barnhart,* 78 Fed. Appx. 808, 813-814 (3rd Cir. 2003).

that he continues to fish, launch a boat, craft furniture, perform maintenance work on the apartment building he owns, ride his motorcycle, cook, drive to Wisconsin, and travel to Switzerland belies his claim that he is unable to perform the work of a scheduler or code enforcement officer. Plaintiff's unusually lengthy administrative hearing testimony consists in large part of his depictions of these activities. Even if the Court had found "internal inconsistencies" in the ALJ's opinion, the record as a whole points overwhelmingly to a finding of non-disability. "[W]here remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 547 (6th Cir. 2004); *citing NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)(plurality opinion).

The overriding question in this appeal is whether the ALJ's decision was supported by substantial evidence. Based on a review of this record, the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, *Mullen v. Bowen*, *supra*, and should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment be DENIED and that Defendant's Motion for Summary Judgment be GRANTED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: October 7, 2005

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 7, 2005.

S/Susan Jefferson
Case Manager